Filed 9/12/22  In re Nicolas R. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re NICOLAS R., a Person Coming Under the Juvenile Court Law. | B314489, B315041 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 18CCJP05213B) |
| Plaintiff and Respondent, | |
| v. | |
| OSCAR R., et al. | |
| Defendants and Appellants. | |

| In re NICOLAS R., a Person Coming Under the Juvenile Court Law. | B314489, B315041 |
|---|---|
| | (Los Angeles County Super. Ct. No. 18CCJP05213B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| ESMERALDA P.-T., et al. | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County, Annabelle G. Cortez, Judge. Conditionally affirmed with directions.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant Oscar R.

Michelle Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant Esmeralda P.-T.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

_____

# INTRODUCTION

Oscar R. and Esmeralda P.-T. appeal from juvenile court orders denying their petitions under Welfare and Institutions Code[1] section 388 seeking to reinstate reunification services and from orders terminating their parental rights to their son, Nicolas R., under section 366.26. Oscar argues the juvenile court abused its discretion in denying his section 388 petition and erred in ruling the parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i), did not apply. Esmeralda argues the juvenile court and the Los Angeles County Department of Children and Family Services did not comply with the inquiry requirement of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and related California law.

We conclude that the juvenile court did not err in denying Oscar's petition under section 388 and that any error the juvenile court may have committed in finding the parental-benefit exception did not apply was harmless. We also conclude, however, that the Department did not comply with its duty under ICWA and related California law to conduct an adequate inquiry into Nicolas's possible Indian ancestry and that the juvenile court failed to ensure the Department conducted a proper inquiry. Therefore, we affirm the juvenile court's orders denying Oscar's and Esmeralda's petitions under section 388, conditionally affirm the court's orders terminating their parental rights, and direct the juvenile court to ensure the Department complies with its duties under ICWA and California law.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

3

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Juvenile Court Detains Nicolas, Sustains a Petition, and Places Nicolas with Esmeralda*

Esmeralda and Oscar are the biological parents of two children, Nicolas and Oscar, Jr.[2] Esmeralda gave birth to Nicolas in July 2019 while the juvenile court had jurisdiction over Oscar, Jr., who was 18 months old at the time. In October 2018 the court detained Oscar, Jr. from his parents and sustained a section 300 petition based on domestic violence between Oscar and Esmeralda, substance abuse by both parents, and violent behavior by Esmeralda. The court ordered Esmeralda and Oscar to participate in drug and alcohol testing and counseling, parenting classes, and domestic violence classes. Before Nicolas was born, both parents had failed to appear for some of their drug tests and tested positive several times when they did. They had also only partially complied with other aspects of their case plans.

In July 2019 Esmeralda admitted to a Department social worker she used methamphetamine while she was pregnant with Nicolas, and Oscar reported he knew she did. She also admitted that she had spent time with Oscar despite their history of domestic violence, that there was a restraining order against Oscar protecting Esmeralda, and that the Department had recommended she and Oscar "keep away from each other" while they worked on their court-ordered case plans. On July 15, 2019 the juvenile court detained Nicolas and removed him from his parents.

---

[2] This appeal involves only Nicolas.

4

The Department filed a petition under section 300, subdivisions (a), (b), and (j), alleging the same conduct that put Oscar, Jr. at risk also put Nicolas at risk of serious physical harm. The Department also alleged Esmeralda's use of methamphetamine and marijuana during pregnancy endangered Nicolas's physical health and safety and placed him at substantial risk of serious physical harm. In October 2019 Esmeralda and Oscar pleaded no contest to an amended petition under section 300, subdivision (j), and the juvenile court dismissed the allegations under section 300, subdivisions (a) and (b).

At disposition the juvenile court declared Nicolas a dependent child of the court, placed Nicolas with Esmeralda, ordered the Department to provide Oscar enhancement services, and allowed Oscar to have unmonitored day visits outside the family home and not in Esmeralda's presence. Oscar's court-ordered case plan included a full drug and alcohol program with aftercare, random and on-demand drug testing, a 52-week domestic violence course, and a parenting class. By March 2020 Oscar had missed 10 drug tests and tested positive four times. His substance abuse and domestic violence programs dismissed him for poor attendance.

B. *The Juvenile Court Sustains a Supplemental Petition and Orders Reunification Services*

After Esmeralda missed several drug tests and had been discharged from her drug treatment program for noncompliance, the juvenile court again detained Nicolas from Esmeralda. On April 6, 2020 the Department filed a supplemental petition under section 387. The court placed Oscar, Jr. and Nicolas with

Elizabeth B., Nicolas's maternal great-aunt, and ordered monitored visits for both parents. The court also issued temporary restraining orders against both parents to protect the children, Elizabeth, and Elizabeth's family. According to the application for a restraining order, Oscar verbally threatened Elizabeth's relatives, sent "aggressive" text messages to the social worker, and tampered with the brakes on the maternal grandmother's car.

Between March and early August 2020 Oscar missed 14 drug tests, tested positive four times, reenrolled in substance abuse and domestic violence programs, was again discharged from those programs for poor attendance, and reenrolled again. Oscar continued behaving aggressively toward the social worker by sending threatening and profane text and voicemail messages. The Department reported Oscar was "aggressive when upset," "act[ed] out" on his emotions, and refused to take responsibility for his actions. Oscar and Esmeralda never ended their relationship and lied to the Department about it. In June 2020 the Department cancelled Oscar's visits with the children after an altercation between Oscar and Esmeralda in which Esmeralda claimed Oscar threatened to "take the children." On July 22, 2020 the court sustained the section 387 supplemental petition.

On August 17, 2020 the juvenile court again declared Nicolas a dependent child of the court, removed Nicolas from his parents, and ordered reunification services and monitored visitation. The court again ordered Oscar to participate in a full drug and alcohol program with random and on-demand testing and aftercare services, a 12-step program with a court card and sponsor, a 52-week domestic violence program, parenting classes, and individual counseling.

C.    *The Juvenile Court Terminates Reunification Services and Denies Petitions by Oscar and Esmeralda Under Section 388*

At the six-month review hearing on February 26, 2021 the juvenile court found Esmeralda and Oscar had not made substantial progress in their case plans and terminated reunification services. Regarding Oscar, the court cited a "lack of substantive and sustained compliance" and numerous pending legal actions. Oscar was arrested twice in October 2020, once for an incident involving Esmeralda and once for vandalism, and again in January 2021 for violating a restraining order protecting Oscar's landlord. The court found Oscar made minimal effort to address his domestic violence, anger, and substance abuse issues; missed multiple drug tests; and had not submitted evidence he was actively engaged in a 12-step program or had a sponsor. Among other incidents the Department reported, Oscar screamed profanities at a Department monitor while he was holding Nicolas and walking with Oscar, Jr. during a visit at a park. The monitor called law enforcement and cancelled the visit because of Oscar's unpredictable and volatile behavior, which the monitor said scared the children. The Department also reported Oscar used profane language in front of Oscar, Jr. to insult a relative during a monitored visit. The juvenile court found Oscar had failed to mitigate the circumstances that supported the court's jurisdiction and had achieved "little or no insight" into those circumstances.

The court also cited Oscar's and Esmeralda's attempts to "create instability" in Nicolas's placement by making "never-ending referrals" to the Department and law enforcement about Nicolas's care. The Department reported Oscar and Esmeralda

7

made 16 calls to the Department's child protective hotline and five requests to law enforcement for a "welfare checkup." The Department alleged Oscar and Esmeralda used these referrals "to lash out against" Elizabeth. For example, on February 8, 2021, Oscar called Elizabeth and left a threatening voicemail message stating, "I was just told that [Nicolas] had some bruises. . . . If you don't [treat him well], you will deal with me. Ok. Fucking old whore." None of the referrals was substantiated. A detective with the Los Angeles County Sheriff's Department told Oscar and Esmeralda he would arrest them if they "called in another fake report."

Oscar told the Department that, following his release from jail in early February 2021, he entered an inpatient drug treatment program. A staff member at the treatment center told the Department that Esmeralda visited Oscar at the facility and that in April 2021 Oscar and Esmeralda went together to Oscar's scheduled visit with Nicolas. After Oscar left the treatment center, Esmeralda picked up Oscar for another visit monitored by Oscar's mother in April 2021. Oscar admitted he allowed Esmeralda access to the children during that visit, and Nicolas indicated in response to a social worker's question that on another occasion he had seen his parents together. The Department asked the juvenile court to terminate Oscar's visitation rights. The court denied the request, but ordered that no one else could be present when Oscar visited Nicolas and that the Department had discretion to select a monitor.

The Department's June 2021 report for the selection and implementation hearing under section 366.26 stated Nicolas had been placed in Elizabeth's home from July 2019, shortly after his birth, to November 2019, and again from April 2020 to the

8

present. The Department reported Nicolas had bonded with Elizabeth and sought comfort from her and her family. The Department stated that Elizabeth provided for Nicolas's physical and developmental needs and that Nicolas demonstrated age-appropriate concern when he lost sight of Elizabeth. The Department also reported that Nicolas had a "healthy bond and secure attachment" to his brother Oscar, Jr. and that Nicolas began to resist visits with Oscar in March 2021. Elizabeth said she had to force Nicolas into her car to take him to visit Oscar.

Esmeralda and Oscar filed petitions under section 388 in May and June 2021, respectively, asking the juvenile court to reinstate their reunification services. As evidence of changed circumstances, Oscar said he had completed an inpatient substance abuse program, enrolled in an aftercare program and co-parenting counseling with Esmeralda, and continued individual counseling. Oscar also stated he had "done more than the 52 weeks of domestic violence" classes. Oscar asserted that additional reunification services would benefit Nicolas because Oscar "maintain[ed] visitation" with Nicolas and showed "commitment" to him. Oscar also said Nicolas knows him as his "'papa.'" Oscar attached to his petition (1) a progress report from the inpatient treatment center, which stated Oscar completed 73 days of a drug treatment program and continued to participate in weekly sessions and random testing; (2) a letter from the inpatient treatment center, which stated Oscar had enrolled in a domestic violence program on February 9, 2021 and had attended eight classes by April 2, 2021; (3) a letter stating Oscar and Esmeralda attended eight sessions of joint therapy over the course of six weeks; and (4) a letter from Oscar's 12-step sponsor.

The juvenile court held a contested hearing on the section 388 petitions. Oscar testified his eight domestic violence classes taught him to recognize how his "need for control" led to a "cycle of violence" in his relationship with Esmeralda. He learned it was "okay" for others to have opinions and views that differed from his and not to place expectations on others that would cause him to become "upset" when his expectations were not met. Oscar testified that in anger management classes he learned to identify the problem and emotion underlying his anger, which helped him to find a solution without resorting to violence. Oscar also said he learned how to listen to Esmeralda's point of view and to process "uncomfortable feeling[s]" about her. Oscar stated that he was spending time apart from Esmeralda "to work on [his] shortcomings" and that he was in conjoint therapy with Esmeralda to "learn how to communicate [with her] in a healthy manner" and "to live independently" from her. Oscar testified he also worked on codependency issues in individual counseling.

Regarding his sobriety, Oscar testified he was in the seventh step of his 12-step program and most recently completed the fourth step of making an inventory of himself. He said doing that work helped him identify the role he played in situations where he felt he was "the victim." Oscar testified that he had a sponsor he contacted daily because he learned isolation was a "trigger for a relapse" and that he wanted to "build a healthy lifestyle" to "learn how to deal with life on life's terms" and not use substances to "deal with negative emotions." He said a healthy lifestyle was also important to be a "good role model" for Nicolas. Oscar acknowledged he previously relapsed following substance abuse treatment, but said he was not "working the 12-step program" at that time.

Regarding his visits with Nicolas, Oscar testified he visited Nicolas every other Saturday in person and every other Wednesday virtually. Oscar admitted that, because of Nicolas's age, the virtual visits were not very "engaging," but he said that he tried to incorporate Nicolas's favorite song and character into the visits. Oscar said that during in-person visits Nicolas ran to him when Nicolas first saw him, that they played together, and that he prepared healthy meals for Nicolas. Oscar said Nicolas resisted and cried when Oscar put him in a car seat at the end of a visit. Oscar admitted he allowed Esmeralda to accompany him on a visit even though the court did not permit joint visits. Oscar also conceded that he had never lived with Nicolas and that he had approximately five visits alone with Nicolas since his birth.

Counsel for the Department argued Oscar had demonstrated that his circumstances may be "changing," but that they had not "changed" enough for the court to grant Oscar's section 388 petition. Counsel for the Department argued that the case had been open three years, that Oscar only recently began "internalizing" his programs, and that Oscar had "a ways to go before he can demonstrate changed circumstances." Regarding Nicolas's best interests, counsel for the Department argued Nicolas's need for permanence and stability outweighed "a possibility of reunifying sometime in the future." Counsel for the Department also stated that reinstating reunification services could be "a disruption" because Elizabeth was in the process of adopting Oscar, Jr.[3] Counsel for Nicolas agreed with the Department that Oscar's commendable efforts demonstrated "changing not changed circumstances."

---

[3] The juvenile court terminated Oscar's and Esmeralda's parental rights to Oscar, Jr. on March 4, 2021.

On August 6, 2021 the juvenile court denied Oscar's and Esmeralda's section 388 petitions. Regarding Oscar, the court acknowledged that he was "beginning to address very complicated and complex issues," but found that Oscar and Esmeralda were "still in the process of defining and untangling their relationship," that there was "no evidence" Oscar and Esmeralda had "remedied the underlying issues including domestic violence and substance abuse," and that therefore Oscar had not shown changed circumstances. The court ruled that, even if Oscar had shown changed circumstances, under the totality of the circumstances "maintaining Nicolas in the current arrangement [was] in his best interest." The court stated that Nicolas had lived with Elizabeth for most of his life and had a strong bond with her, that Oscar had not advanced beyond monitored visitation, and that Nicolas had a "significant need for permanency and stability" Oscar could not yet provide.

### D. *The Juvenile Court Terminates Oscar's and Esmeralda's Parental Rights*

The contested section 366.26 hearing overlapped in part with the contested hearing on the section 388 petitions. After the juvenile court denied Oscar's section 388 petition, Oscar testified Nicolas enjoyed Oscar's in-person visits with him, which were every other Saturday at a park for four hours.[4]

Oscar said that at the beginning of their visits Nicolas reached up to him with a big smile on his face and outstretched arms when Oscar removed him from his car seat. Oscar said that he held Nicolas for 10 to 15 minutes while he spoke to and was

---

[4]    Oscar's virtual visits with Nicolas ended because there was no one available to monitor them.

affectionate with him and that he then served Nicolas a homemade lunch and fruit, changed his diaper, and played with him. During the visits, Oscar and Nicolas played at a playground, and Oscar brought activities for Nicolas, including paints and blocks. Oscar said he used these activities to teach Nicolas colors and counting. Oscar also said that he and Nicolas shared moments of affection throughout their visits and that Oscar comforted Nicolas if he fell.

Oscar stated that, toward the end of their visits, he gave Nicolas a snack and changed his clothes and diaper to make sure Nicolas felt "comfortable on the ride home." Oscar testified Nicolas demonstrated he did not want their visits to end by saying "no" when Oscar changed him into clean clothes and by trying to go back to the playground. When Oscar tried to put Nicolas back in the car seat, Nicolas "put up a struggle" and reached out to Oscar.

Oscar testified that Nicolas always responded to him with "joy" and that their bond was strong. Oscar said he believed that it was "very important" for Nicolas to have a relationship with his father and that he wanted to be involved in Nicolas's life to "help guide him in the right direction," even if Oscar did not have custody of Nicolas. If the court terminated Oscar's parental rights, Oscar said, Nicolas would "miss out on that bonding that [they] already established." Oscar also said that he had concerns Nicolas would have "abandonment issues" and that "there is a huge difference [between] a father's presence [and] a male's presence."

Counsel for Oscar asked the juvenile court to apply the parental-benefit exception to terminating Oscar's parental rights. Counsel argued that, despite their infrequent visits, Oscar had a

13

"deep parental bond" with Nicolas. Counsel for Oscar asserted Nicolas showed a "deep emotional attachment" to Oscar, as evidenced by Nicolas's behavior during visits with Oscar and their affection for each other. Counsel also argued Oscar played a parental role in Nicolas's life by comforting Nicolas when he fell, teaching him things, preparing food for him, grooming him, and organizing his activities.

Counsel for Oscar argued terminating Oscar's parental rights would be detrimental to Nicolas because Nicolas had a "deep attachment" to Oscar and would wonder "what happened" if their visits ended. Counsel said that Nicolas's brother, Oscar, Jr., would remember their father even if Nicolas did not and that Nicolas would "struggle" with not having Oscar in his life. Counsel for Oscar acknowledged that Elizabeth cared for Nicolas, but argued that her care was not on "the same level of [Oscar's] deep love and care for his son."

Counsel for Nicolas argued there was clear and convincing evidence that Nicolas was adoptable and that no exception to terminating Oscar's parental rights applied. Counsel commended Oscar for his "genuine efforts" to make positive changes in his life, but argued Nicolas was "extremely attached" to Elizabeth and looked to her as his "comfort, his stability, and his main parent figure." Because Nicolas had developmental delays and was so young, counsel argued, Nicolas's need for stability supported the termination of Oscar's parental rights. Counsel for Nicolas stated that there was no evidence Nicolas would be "greatly harmed" if Oscar's visits with Nicolas ended and that Nicolas's behavior at the end of his visits with Oscar could simply mean Nicolas wanted to keep playing. Finally, counsel for

14

Nicolas argued adoption was appropriate because it would keep Nicolas together with his sibling.

Counsel for the Department agreed there was insufficient evidence Nicolas would be greatly harmed if his relationship with Oscar ended. While counsel for the Department acknowledged that Oscar appeared to be loving and affectionate with Nicolas, she pointed out that Oscar never had custody of Nicolas and that Nicolas was bonded to Elizabeth and comfortable in his current home environment where he had spent most of his life.

The juvenile court found that Nicolas was likely to be adopted and that "no exception to adoption applies in this case." The court stated Elizabeth wanted to adopt Nicolas, had an approved assessment, provided day-to-day care for Nicolas, followed up on Nicolas's needs (such as by enrolling him in a preschool program), and fulfilled the role of a parent in his life. The court cited evidence that Nicolas sought out Elizabeth for comfort and soothing, that the Department had no concerns about Elizabeth's care for Nicolas, that Nicolas called Elizabeth "Mama," and that Nicolas lived with his brother and had lived with Elizabeth for most of his life.

The juvenile court ruled Oscar had not met his burden of showing the parental-benefit exception applied. The court found that, while Oscar's version of his visits with Nicolas was positive, other evidence was "not wholly consistent with his assessment of the visits." Although Oscar had more recently maintained regular visitation, the court observed that Oscar never had custody of Nicolas, that his visits with Nicolas were still monitored, and that there was evidence inconsistent with Oscar's "mostly positive" assessments of his visits with Nicolas. The court also stated that only recently had Oscar prepared meals

and snacks for Nicolas during their visits and that on at least one occasion Oscar asked Esmeralda to bring milk for Nicolas during Oscar's visit, which violated the court's orders. The court acknowledged that Nicolas enjoyed his visits with Oscar, but found that enjoyment, without more, was not enough to show the "substantial emotional attachment . . . required for parents to meet their burden" to prove the parental-benefit exception.

The court found Oscar's positive interactions with Nicolas did not outweigh Nicolas's need for stability and structure with Elizabeth. In particular, the court found Oscar's role in making unfounded referrals to the Department and law enforcement undermined Nicolas's stability, subjected Nicolas to unnecessary medical exams, and demonstrated "unresolved dynamics" in Oscar's relationship with Esmeralda. The court stated that its concerns about Oscar's relationship with Esmeralda had "subsided," but that Oscar had not yet eliminated them. As a result, the court ruled, Oscar failed to show terminating his parental rights would be detrimental to Nicolas when weighed against the benefits of adoption. The court stated "neither parent occupies the parental role to such a degree [that] terminating the parental rights would be detrimental to Nicolas." Instead, the court found, many of Oscar's and Esmeralda's actions fueled "instability and distress for Nicolas." Because no exception to adoption applied, the court terminated Oscar's parental rights and found Nicolas adoptable. The court also terminated Esmeralda's parental rights.

E.    *The Juvenile Court Finds Nicolas Is Not an Indian Child*

Esmeralda and Oscar each checked the box stating "I have no Indian ancestry as far as I know" on the Parental Notification of Indian Status forms they filed on July 18, 2019. They confirmed that information in interviews with the Department in September 2019. The juvenile court had previously found in connection with Oscar, Jr.'s case that ICWA did not apply, and the Department's reports in Nicolas's case repeated that finding. According to Esmeralda, the Department knew of and contacted many of Nicolas's maternal and paternal relatives, but the Department did not ask any of them if Nicolas had Indian ancestry. The juvenile court found on several occasions that neither Esmeralda nor Oscar had Indian ancestry and that the court had no reason to know Nicolas was an Indian child.

F.    *Oscar and Esmeralda Timely Appeal*

Oscar and Esmeralda timely appealed from the juvenile court's orders denying their section 388 petitions and terminating their parental rights.[5] Oscar argues the juvenile court abused its

---

[5]    Esmeralda's notice of appeal checked the box stating she was appealing from an order denying a petition under section 388, but she identified the wrong date for that order. We liberally construe the notice of appeal in favor of its sufficiency and protect the right of appeal where it is reasonably clear what the appellant was trying to appeal from and where the respondent could not possibly have been misled or prejudiced. (*In re J.F.* (2019) 39 Cal.App.5th 70, 75; see *In re Joshua S.* (2007) 41 Cal.4th 261, 272.) The Department does not argue Esmeralda's notice of appeal failed to provide sufficient notice.

17

discretion in denying his section 388 petition and applied the wrong legal standard in determining whether to apply the parental-benefit exception to the permanent plan of adoption. He also argues we should restore his parental rights if we restore Esmeralda's parental rights.

Esmeralda argues that the court and the Department failed to comply with the duty of inquiry under ICWA and related California law and that the order terminating her parental rights should be reversed. She also argues the order terminating her parental rights should be reversed if we reverse the order terminating Oscar's parental rights. Esmeralda does not contend the juvenile court erred in denying her section 388 petition, even though she appealed from that order.

## DISCUSSION

A.    *The Juvenile Court Did Not Err in Denying Oscar's Section 388 Petition*

1.    *Applicable Law and Standard of Review*

Section 388, subdivision (a)(1), provides: "Any parent or other person having an interest in a child who is a dependent of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." "Section 388 provides for modification of juvenile court orders

We construe it to appeal from the juvenile court's order denying her section 388 petition on August 6, 2021.

18

when the moving party presents new evidence or a change of circumstance and demonstrates modification of the previous order is in the child's best interest." (*In re Malick T.* (2022) 73 Cal.App.5th 1109, 1122.) "The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances and (2) that the proposed modification would be in the best interests of the child. [Citation.] [T]he change in circumstances must be substantial." (*Ibid.*, internal quotation marks omitted; see *In re J.M.* (2020) 50 Cal.App.5th 833, 845)

"[A] section 388 petition seeking reinstatement of reunification services or return of the child will necessarily involve a parent who has made mistakes sufficient to support termination of services at some point in the past. The question must be whether the changes the parent made since then are substantial enough to overshadow that prior determination, such that reunification is now in the child's best interests." (*In re J.M.*, *supra*, 50 Cal.App.5th at p. 848.) Where, as here, "a section 388 petition is filed after family reunification services have been terminated, the juvenile court's overriding concern is the child's best interests. [Citation.] The parent's interests in the care, custody and companionship of the child are no longer paramount; and the focus shifts to the needs of the child for permanency and stability." (*In re Malick T.*, *supra*, 73 Cal.App.5th at pp. 1122-1123.) In these circumstances, "the 'ultimate question' on a section 388 petition" is whether additional reunification services are in a child's best interests in light of any changed circumstances and the evidence in the record as a whole. (*J.M.*, at p. 847.)

We review the juvenile court's finding Oscar failed to meet his burden to demonstrate a substantial change of circumstances by determining whether the evidence compels a finding in his favor on that issue as a matter of law. (See *In re N.O.* (2019) 31 Cal.App.5th 899, 925; *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1163.) Specifically, we determine whether "the evidence 'was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*In re Luis H.* (2017) 14 Cal.App.5th 1223, 1227; see *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) We review for abuse of discretion the juvenile court's ruling that providing Oscar additional reunification services was not in Nicolas's best interest. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re J.C.* (2014) 226 Cal.App.4th 503, 525-526.)

2.      *Oscar Has Not Shown That the Evidence Compels a Finding of Changed Circumstances or That the Juvenile Court Abused Its Discretion*

Oscar does not identify any way in which the juvenile court erred in finding he did not show changed circumstances. Oscar merely restates the evidence he presented in support of his section 388 petition and argues that he "demonstrate[d] changed circumstances" and that Nicolas will experience "trauma" if he loses his relationship with Oscar. Oscar has failed to meet his burden on appeal to show the juvenile court erred. (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1161 [a court will not presume error where the appellant has not demonstrated any]; *In re*

20

*J.F.* (2019) 39 Cal.App.5th 70, 79 ["[t]he juvenile court's orders are 'presumed to be correct, and it is appellant's burden to affirmatively show error'"].)

Moreover, and contrary to Oscar's suggestion the juvenile court acted "in a cavalier manner by finding changing rather than changed circumstances," the juvenile court thoroughly considered the evidence Oscar presented of changed circumstances. While commending Oscar's progress, the court found Oscar had shown only he was beginning to address the issues that led to the court's jurisdiction over Nicolas. Indeed, Oscar had been sober for only six months at the time of the section 388 hearing (after more than two years of services that began when Oscar, Jr. was detained), he admitted to relapses, and he was still in the process of working his way through a 12-step program. (See *In re N.F.* (2021) 68 Cal.App.5th 112, 122 [given the mother's "history, her recent completion of yet another program did not constitute a material change in circumstances"]; *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 [a parent's "recent sobriety" was not a material change of circumstances where the parent had "a history of drug relapses," was "in the early stages of recovery," and was "still addressing a chronic substance abuse problem"]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [parent's seven months of sobriety since a relapse was not sufficient to show a material change in circumstances].) Similarly, Oscar and Esmeralda had just begun to "untangle" their relationship, with Oscar taking time "apart" from Esmeralda to improve himself. There was no evidence Oscar and Esmeralda's history of domestic violence was behind them. The evidence did not compel a finding of changed circumstances.

21

The court also provided a reasoned explanation why granting Oscar's petition was not in Nicolas's best interest. Notably, Oscar did not provide any evidence at the section 388 hearing that extending his reunification services would advance Nicolas's need for permanency and stability, and he points to none on appeal. (See *In re J.C., supra*, 226 Cal.App.4th at p. 527 [a parent's petition for an order reinstating reunification efforts "must establish how such a change will advance the child's need for permanency and stability"].) The juvenile court did not abuse its discretion. (See *ibid.* [juvenile court did not err in denying a parent's section 388 petition where "rewarding [the parent] for her hard work and efforts" did not outweigh the child's interests "not to further delay permanency and stability"].)

B. *The Juvenile Court Did Not Commit Prejudicial Error in Finding the Parental-benefit Exception Did Not Apply*

1. *Applicable Law and Standard of Review*

The purpose of a section 366.26 hearing is "'to select and implement a permanent plan for the child'" after reunification services have been terminated. (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*); see *In re D.M.* (2021) 71 Cal.App.5th 261, 268.) If the court determines "the child is likely to be adopted," the court must "terminate parental rights to allow for adoption." (*Caden C.*, at p. 630; see § 366.26, subd. (c)(1).) "But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, at pp. 630-631; see § 366.26, subd. (c)(1)(B), (4)(A).)

One of those reasons, the parental-benefit exception, requires the parent to establish by a preponderance of the evidence (1) "the parent has regularly visited with the child," (2) "the child would benefit from continuing the relationship," and (3) "terminating the relationship would be detrimental to the child." (*Caden C.,* at p. 629; see § 366.26, subd. (c)(1)(B)(i); *D.M.,* at p. 268.)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra,* 11 Cal.5th at p. 632; see *In re A.L., supra,* 73 Cal.App.5th at p. 1151.) The Department concedes Oscar met this element.

To establish the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra,* 11 Cal.5th at p. 636; see *In re J.D.* (2021) 70 Cal.App.5th 833, 852.) The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.,* at p. 632; see *J.D.,* at p. 854.) In evaluating the attachment, "courts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.,* at p. 632; see *J.D.,* at pp. 854-855.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633; see *In re A.L.*, *supra*, 73 Cal.App.5th at p. 1151.)

A "substantial evidence standard of review applies to the first two elements." (*Caden C.*, *supra*, 11 Cal.5th at p. 639; see *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 206.) Regarding the third element, the "court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision . . . is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, at p. 640; see *L.A.-O.*, at p. 206.) We review claims of legal error de novo. (See *In re D.O.* (2016) 247 Cal.App.4th 166, 174 [a reviewing court determines de novo whether a juvenile court erroneously construed the factors relevant to the sibling-relationship exception].)

2.     *Oscar Has Not Demonstrated Prejudicial Error*

Oscar argues the juvenile court, in finding the parental-benefit exception did not apply, erred in two respects. First, Oscar contends that, by focusing on the second prong of the *Caden C.* analysis, the juvenile court improperly applied "a two-

part analysis, rather than the three-part analysis" set forth in *Caden C.* The juvenile court, however, considered and made findings on all three elements of the *Caden C.* test. Regarding the third, as stated the court ruled "the parents have failed to show that terminating the parental rights would be detrimental to Nicolas when weighed against the benefits of adoption."

Second, Oscar contends the juvenile court misapplied *Caden C.* by requiring Oscar to show he occupied a parental role in Nicolas's life and by stating Nicolas's caregiver "occupied that parental role." Regarding the second step of the parental-benefit exception test, Oscar suggests the juvenile court inappropriately measured Oscar's role against that of Elizabeth's, contrary to the Supreme Court's statement in *Caden C.* that "it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits'" in determining whether a child had formed a substantial emotional attachment with his or her parent. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) But consistent with *Caden C.* the juvenile court found Oscar's evidence fell "short of showing a substantial emotional attachment that's required for parents to meet their burden" of demonstrating that the parental-benefit exception applies, and Oscar does not argue substantial evidence did not support that finding. (See *id.* at p. 636.)

Regarding the third step of the parental-benefit exception test, Oscar asserts the court's reference to the role Elizabeth played in Nicolas's life suggests the court may have improperly compared Oscar's attributes as a custodial caregiver to those of Elizabeth in determining whether termination would be

25

detrimental to Nicolas. (See *Caden C.*, *supra*, 11 Cal.5th at p. 634 [when "weighing whether termination would be detrimental," the juvenile court should not "compar[e] the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)"]; *In re D.M.*, *supra*, 71 Cal.App.5th at p. 270 [the Supreme Court in *Caden C.* "made clear the beneficial relationship exception is *not* focused on a parent's ability to care for a child or some narrow view of what a parent-child relationship should look like"].) Any inconsistency between *Caden C.* and the juvenile court's evaluation of Nicolas's relationship with Oscar, however, was harmless for two reasons.

First, Oscar presented almost no evidence that terminating his relationship with Nicolas, however positive that relationship might be, would be detrimental to Nicolas, and the record included considerable support for the juvenile court's finding that Oscar's visits with Nicolas contributed to "instability in Nicolas's placement." (See *In re J.R.* (Aug. 22, 2022, A164334) ___ Cal.App.5th ___, ___ [2022 WL 3582652, at p. 4] ["when, as in this case, the proper legal standard is already established and a party has had a full and fair opportunity to present all of their evidence on a contested issue, and yet in the end there is simply no evidence that could support a favorable finding for them, then any legal error in the court's reasoning or basis for its decision quite obviously is harmless"].) Indeed, counsel for Oscar merely stated her opinions that "severing the parental rights would be detrimental to Nicolas" and that Nicolas would have "abandonment issues." There was no evidence, for example, that the effects of severing Nicolas's relationship with Oscar "might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression."

26

(*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Nor was there evidence of how losing that relationship would affect Nicolas or what Nicolas's life would be like without Oscar in it. (See *ibid*.)

The only evidence Oscar presented that arguably showed Nicolas might miss his visits with Oscar (but not necessarily that he would suffer any detriment) was that Nicolas held up his arms to Oscar or ran to him when Nicolas first arrived at the park for visits and that Nicolas "put up a struggle" and reached out to Oscar at the end of those visits. While it is undoubtedly difficult for any two-year-old to express emotional attachment and desires,[6] and it appears Nicolas may have enjoyed the visits, the evidence Oscar presented did not show that ending the visits would cause Nicolas any detriment. (Cf. *In re D.M.*, *supra*, 71 Cal.App.5th at p. 271 [children had lived with their father for two to eight years, wanted to return to him, and cried when visits with him concluded]; *In re J.D.*, *supra*, 69 Cal.App.5th at pp. 857-858 [child frequently expressed a desire to go to his mother's house, told her he loved her, and sought her attention during visits]; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1229 & fn. 4 [children looked forward to seeing their parents, greeted them with hugs, and expressed sadness at the end of visits].)

Second, other evidence in the record contradicted Oscar's positive assessment of his visits with Nicolas, including Oscar's inappropriate behavior in front of Nicolas during previous visits, Nicolas's resistance to visiting his father, and Oscar's false reports of child abuse. The juvenile court acknowledged that it had denied the Department's request to terminate Oscar's visits with Nicolas, but stated that "the concerns that the Department

---

[6]    There is evidence in the record that Nicolas suffered from "poor development in the receptive language domain."

raised with respect to the quality of the contacts between the parents and the safety issues that resulted from their contact with Nicolas were legitimate. And many of these safety concerns stem from the parents' unresolved dynamics . . . , which has impacted their visits and their contact with Nicolas." And the evidence Nicolas would benefit from adoption by Elizabeth was significant. On this record, any error in the juvenile court's ruling on the third prong of the *Caden C.* analysis was harmless.[7]

C.    *The Department Did Not Comply with ICWA and Related California Law*

Esmeralda contends the Department and the juvenile court failed to comply with the duty of inquiry under ICWA and related state law. In particular, she argues the Department failed to ask Nicolas's relatives whether they knew or had reason to know Nicolas was an Indian child. """Federal regulations implementing ICWA . . . require that state courts "ask each participant in an emergency or voluntary or involuntary child-

_____

[7]    The court in *In re A.L.*, *supra*, 73 Cal.App.5th 1131 recently addressed whether a juvenile court, in assessing the third step of the parental-benefit exception under *Caden C.*, may consider the extent to which "the caregivers and father occupied parental roles with the minor." (*A.L.*, at p. 1157.) Because the Supreme Court in *Caden C.* stated that, "[i]n many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home," the court in *A.L.* concluded that whether a parent has played a parental role "is a relevant consideration to the court's detriment finding." (*A.L.*, at p. 1157, quoting *Caden C., supra*, 11 Cal.5th at p. 634.) We need not reach this issue.

28

custody proceeding whether the participant knows or has reason to know that the child is an Indian child.""""" (*In re J.C.* (2022) 77 Cal.App.5th 70, 77; see 25 C.F.R. § 23.107(a) (2021).) State law "'more broadly imposes on social services agencies and juvenile courts . . . an "affirmative and continuing duty to inquire" whether a child in the dependency proceeding "is or may be an Indian child."'" (*J.C.*, at p. 77; see § 224.2, subd. (b).) The Department does not contest Esmeralda's position, stating only it "submits the ICWA issue to the Court."

Esmeralda is correct: The Department failed to conduct an adequate inquiry into Nicolas's Indian ancestry by failing to ask Nicolas's extended family members whether he is, or may be, an Indian child. (See *In re J.C.*, *supra*, 77 Cal.App.5th at p. 77 ["The Department's failure to ask [a child's] extended relatives about [his or her] possible Indian ancestry violated the express mandate of section 224.2, subdivision (b)."].) The Department does not argue otherwise. Therefore, we direct the juvenile court to ensure the Department contacts Nicolas's ascertainable extended family members to inquire about Nicolas's possible Indian ancestry. And because we must conditionally affirm the juvenile court's order terminating Esmeralda's parental rights pending the Department's and the juvenile court's compliance with ICWA and related state law, we also conditionally affirm the juvenile court's order terminating Oscar's parental rights. (See *In re A.L.* (2010) 190 Cal.App.4th 75, 80 ["with some exceptions, . . . a court may not terminate the parental rights of only one parent"]; Cal. Rules of Court, rule 5.725(a)(1).) Neither Esmeralda nor Oscar argues the Department's or the juvenile court's failures to comply with ICWA and related state law affect the court's orders denying their section 388 petitions.

## DISPOSITION

The juvenile court's orders denying Oscar's and Esmeralda's section 388 petitions are affirmed. The juvenile court's orders terminating Oscar's and Esmeralda's parental rights are conditionally affirmed. The juvenile court is directed to ensure the Department complies fully with the inquiry and, if necessary, notice provisions of ICWA and related California law

SEGAL, J.

We concur:

PERLUSS, P. J.

FEUER, J.

30